IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs September 7, 2016

**STATE OF TENNESSEE v. KRISHON HARRIS**

**Appeal from the Criminal Court for Shelby County**
**No. 13-06187          Glenn I. Wright, Judge**

———————————————————

**No. W2015-01917-CCA-R3-CD  -  Filed January 20, 2017**

———————————————————

A Shelby County jury convicted the Defendant, Krishon Harris, of three counts of criminally negligent homicide, one count of vehicular assault, one count of reckless aggravated assault, two counts of driving under the influence, one count of reckless driving, and one count of driving with a suspended license.  The trial court merged the three homicide convictions, merged the aggravated assault conviction and the two driving while under the influence convictions into the conviction for vehicular assault, and then sentenced the Defendant to a total effective sentence of ten years in the Tennessee Department of Correction.  On appeal, the Defendant contends that the evidence is insufficient to sustain his convictions for criminally negligent homicide and vehicular assault.  After review, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and D. KELLY THOMAS, JR., JJ., joined.

Mark Mesler, Memphis, Tennessee, for the appellant, Krishon Harris.

Herbert H. Slatery III, Attorney General and Reporter; Jonathan H. Wardle, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Stephanie Johnson and Jennifer Morris, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts**

This case arises from a traffic accident that occurred on August 9, 2013.  A Shelby County grand jury indicted the Defendant for eleven counts: three counts of vehicular homicide of the victim, Eric Beasley (two of these alleged intoxication, one of which was

.08 or more); one count of vehicular assault of a second victim, Miesha Lucas; one count of reckless aggravated assault of Ms. Lucas; four counts of driving while intoxicated ("DUI") (two of these counts involving marijuana); one count of reckless driving; and one count of driving while his license was suspended, second offense.  Before trial, the State dismissed the two counts of driving under the influence of marijuana.  The parties presented the following evidence at trial:  Matthew Chaney, an officer with the Memphis Police Department ("MPD"), testified that he responded to a call on August 9, 2013, about a domestic dispute involving a mother and her son.  When he arrived, the son had left the scene, but the officer noticed the Defendant drinking a beer and sitting in the driveway of the home to which he had responded.  Officer Chaney said that he knew the Defendant and told the Defendant that he should not drive and should stay home that evening.  Officer Chaney said that he left the scene and resumed his regular duties.  A short time later, as he was issuing a driver a misdemeanor citation, he observed the Defendant drive by in a Lincoln Town Car.  He said that he could not stop the Defendant at the time, as he was engaged in issuing a citation.  Two minutes later, a witness flagged down the officer while he was still issuing the citation and said that there had been an accident.

Officer Chaney testified that he went to the accident scene, and he saw a motorcycle and the Lincoln Town Car that the Defendant had been driving.  A man, who appeared to be dead, and a critically injured woman were lying on the ground.  Officer Chaney focused his attention on the woman, helping to support her until emergency responders arrived.  Officer Chaney said he had no contact with the Defendant at the accident scene.

During cross-examination, Officer Chaney agreed that the domestic dispute to which he was called earlier that evening did not involve the Defendant.  He said that the dispute involved the Defendant's brother and the Defendant's mother.  Officer Chaney was aware at the time that the Defendant's brother suffered some mental health issues.  Officer Chaney agreed that he was not at the home for long and that he saw the Defendant with only the one beer.  He briefly told him not to drink and drive, but it did not appear the Defendant had any intention of doing so.  The officer said that, when he issued the misdemeanor citation, he was ten to twelve houses away from where he originally encountered the Defendant.  He confirmed that there was a BP gas station one traffic light away from where the accident occurred.

James Brown, an officer with the MPD, testified that he responded to the call about the traffic accident in this case.  While he was with Officer Chaney and another officer, Officer Till, a motorist flagged him down saying that there had been a car accident.  All three officers went to the accident scene, which he described similarly to Officer Chaney's testimony.  Officer Brown said that, when he first arrived at the scene,

2

he began asking witnesses questions. Officer Brown noted that the Defendant was standing by the Lincoln Town Car and told him that he was the driver of the car at the time of the accident. Officer Brown asked him for his license and insurance, and the Defendant responded that he only had identification. Officer Brown noted the "moderate" smell of an intoxicant on the Defendant's breath. Officer Brown asked the Defendant to sit in his patrol car while he investigated the accident. Officer Brown said that he then taped off the area, called for back-up, and called paramedics.

During cross-examination, Officer Brown testified that he had not seen the Lincoln Town Car before the accident. He said that he responded to the accident scene as soon as the motorist flagged him down, and he was the first officer at the scene. He described the Defendant as cooperative.

William C. Porter, a sergeant with the MPD, testified that his assignment included investigating fatal car accidents. He said that on August 9, 2013, at around 2:30 a.m. he responded to this accident scene. When he arrived, he saw a brown Lincoln Town Car parked at a service station and a body on the roadway next to a bench. He approached the body and discovered that the man was deceased. Sergeant Porter said that medical personnel attended to an injured woman, and he investigated the accident scene. He said that he found the Lincoln Town Car's driver's bumper in an area of the center lane where it should not have been; rather it should have been in the right lane. He asked other officers if the driver was still at the scene, and he learned that the driver was in the back seat of a police cruiser. Sergeant Porter said he asked the driver to tell him how the accident occurred.

The driver told the sergeant that he was southbound in the center lane when he decided to make a right turn into the BP service station. As he started making his turn, a motorcycle hit the right front corner of his vehicle and went off the roadway. The driver said that, right after the impact, he did not know what to do, so he started to make a U-turn and parked in the BP Service Station parking lot, about 100 feet from where the accident occurred. Sergeant Porter photographed the scene. He showed the jury those photographs, and he said that they confirmed what the driver had told him.

During cross-examination, Sergeant Porter testified that emergency responders had transported one of the victims from the scene before he got there. He agreed that he could not identify the Defendant as the driver that he spoke with that evening. Sergeant Porter testified that, in his opinion, the evidence at the scene showed that the driver's vehicle had to be in the left-hand lane of the two southbound lanes and that it turned right in front of the motorcycle, causing the motorcycle to hit the right front side of the driver's vehicle.

3

Kenneth Calhoun, a sergeant with the MPD, testified that as part of the Special Traffic Bureau, he responded to fatal car accidents. He responded to the scene of this accident shortly after 2:00 a.m. and took charge of the accident scene. He confirmed much of Sergeant Porter's testimony, saying that he also measured the accident scene, where the tires may have stopped, where the body landed, and any other measurements of items of debris from the accident. He created two diagrams of the accident scene, one from hand and one computer-generated, which he showed to the jury. Sergeant Calhoun said that there were actually three southbound lanes in the area where the accident occurred.

Alison Howard, an MPD DUI officer, testified that she responded to a call about the accident because officers thought the Defendant may have been driving under the influence. When she arrived, she advised the Defendant that she was going to perform some Standardized Field Sobriety exercises. She noted that he had a "moderate odor of alcohol" emanating from his breath and that his eyes were bloodshot and watery. Officer Howard testified that she instructed the Defendant on the "walk and turn" test, and he lost his balance during the instructions. He also did not turn correctly when performing the test. Officer Howard testified that she administered the one-legged stand test to the Defendant, and he performed it successfully. She noted in her report that the effects of alcohol that the Defendant exhibited were "slight." She further stated that, while the odor was slight, the Defendant still seemed confused, required repeated instructions to perform the test, and smelled of alcohol. On this basis, she determined that he needed to submit to a Blood Alcohol Concentration Test. She opined that he should not have been driving a motor vehicle. A videotape of Officer Howard's interactions with the Defendant was played for the jury.

During cross-examination, Officer Howard agreed that she had not indicated in her report that the Defendant had difficulty speaking.

William Land, Jr., a paramedic with Methodist University Hospital, testified that he responded to this accident scene. He said he arrived at the accident scene three minutes after receiving the call about the accident. When he arrived, he saw the female victim face-down at the end of the gas station parking lot. The male victim was "wrapped around [a] bench." He went to attend to the female victim while firefighters rendered aid to the male victim. He described the female victim as face-down with her helmet partially removed. He said that she was conscious, crying, and obviously in pain. She repeatedly told him that her back hurt. Mr. Land placed the victim in a "C Spinal Mobilization" and secured her to a long spine board before moving her into the ambulance.

4

Mr. Land testified that he assessed the female victim's injuries. She had multiple abrasions, also called road rash, from skidding on the ground. She had a large, open, bleeding wound to her left shoulder. From the deformity of her leg, he knew she had a fracture below the knee. Mr. Land took the victim to Regional One Trauma Center.

During cross-examination, Mr. Land testified that his report indicated that this crash was a high speed impact but that he could not estimate the speed.

Miesha Lucas, who was twenty-seven years old, testified that she and the other victim, Eric Beasley, were in a romantic relationship and had been living together for five years at the time of the accident. The two owned a tow truck service together and fixed eighteen-wheelers "on the road." Ms. Lucas said that, on August 8, 2013, she was at her mother's house, and Mr. Beasley arrived there at around 9:00 p.m. She said that the two left her mother's house at around midnight or 1:00 a.m. on their newly acquired motorcycle and headed home. She said that, on their way home, they were hit by a car.

Ms. Lucas described the events leading to the accident stating, that they were about three blocks from home and were stopped at a red light. She said they were in the turn lane of the three-lane roadway preparing to turn right toward their home. The car that hit them was in the middle lane. When the light turned green, they began to drive again, she noticed bright lights coming toward them. She saw the car turn toward them but could not recall anything further.

Ms. Lucas described her injuries, saying that she had broken her pelvis, spine, neck, and shattered her hip down to her femur. She said she also suffered kidney, liver, and spleen damage, in addition to being covered in road rash. Ms. Lucas said she was hospitalized for a few weeks and required several medical procedures and surgeries while hospitalized, including having metal rods placed in her spine and a total hip replacement. She had to relearn to walk and was still working to do things as simple as tying her own shoes. She said that, because she was "so young" at the time of the accident, doctors had to monitor her bone growth. She described this process as placing her in "[h]orrible pain." Ms. Lucas described a hole in her right shoulder that took four months to heal and which necessitated frequent cleaning during that time by a nurse. She further stated that she would require more surgeries.

Ms. Lucas recounted that she and Mr. Beasley had recently purchased the motorcycle as part of their towing business so that they could sponsor motorcycle races. She said the motorcycle had halogen lights, which were "[r]eal bright lights." She also recalled that the motorcycle was "really loud" and had bright paint with their company logo.

5

During cross-examination, Ms. Lucas said that neither she nor Mr. Beasley had consumed any alcohol or drugs on the evening of this accident.

Julian Conyers, a special forensic sceintist agent with the Tennessee Bureau of Investigations ("TBI"), testified as an expert in the field of blood alcohol toxicology. He stated that he analyzed the Defendant's blood sample and determined that the ethyl alcohol level in the blood sample was "0.08 gram percent." Agent Conyers said that the sample was taken from the Defendant at 4:43 a.m. and that, at 2:30 a.m., the Defendant's blood alcohol level would have been anywhere from .10 to .12.

During cross-examination, Agent Conyer agreed that everyone eliminated alcohol from their system differently, so the numbers he provided were estimates.

John Barry O'Neil,Jr., a lieutenant with the Memphis Fire Department, testified that he pronounced Mr. Beasley dead at the accident scene. He said that it appeared that Mr. Beasley had broken his neck. The medical examiner, Dr. Marco Ross, confirmed that Mr. Beasley died due to multiple blunt force traumas, many of which individually would have been fatal. Mr. Beasley was forty years old at the time of his death. Mr. Beasley's blood showed the presence of marijuana in his system.

The State offered proof that the Defendant's driver's license had been suspended.

At the conclusion of trial, the jury convicted the Defendant of: three counts of the lesser included offense of criminally negligent homicide; one count of vehicular assault; one count of reckless aggravated assault; two counts of DUI; one count of reckless driving; and one count of driving on a suspended license. The trial court merged the three counts of criminally negligent homicide, and sentenced the Defendant to three years of incarceration. It also merged the two DUI convictions and the reckless aggravated assault conviction into the vehicular assault conviction, and sentenced the Defendant to seven years of incarceration consecutive to the criminally negligent homicide sentence. The trial court sentenced the Defendant to six months for the reckless driving conviction and to eleven months and twenty-nine days for the driving on a suspended license conviction. It ordered that both of these sentences run concurrently with the others. The Defendant's total effective sentence is ten years.

It is from these judgments that the Defendant now appeals.

## II. Analysis

On appeal, the Defendant contends that the evidence is insufficient to sustain his convictions for criminally negligent homicide and vehicular assault. He asserts that the

6

jury's verdicts were inconsistent. He states that by finding him guilty of the lesser-included offense of criminally negligent homicide, the jury determined that Mr. Beasley's death was not the proximate result of the Defendant's impairment. It then, however, found him guilty of the vehicular assault of Ms. Lucas, which required it to find that her injuries were the proximate cause of his intoxication. He asserts that, because the two victims were on the same motorcycle, the jury's verdicts are inconsistent and the judgments of conviction against him cannot stand. The State counters that the evidence is sufficient to sustain each conviction and that the Tennessee Supreme Court has already rejected the doctrine of inconsistent verdicts. We agree with the State.

Inconsistent verdicts are unassailable absent a legal insufficiency. *State v. Davis*, 466 S.W.3d 49, 73 (Tenn. 2015) (concluding that this rule applied when the jury, in one count, convicted the defendant of second degree murder, thereby establishing that he committed a knowing killing and then, on the second count, the jury acquitted the defendant of second degree murder, choosing instead to convict the defendant of reckless homicide). The Tennessee Supreme Court stated, "We continue to agree with the significant majority of jurisdictions that inconsistent jury verdicts are not a basis for relief." *Id.* The verdicts are still subject, however, to analysis of whether the evidence is sufficient to sustain them. *Id.* at 72; *see also State v. Ike O. Nwangwa*, No. E2015-01086-CCA-R3-CD, 2016 WL 1615670, at *3 (Tenn. Crim. App., at Knoxville, Apr. 20, 2016), *no Tenn. R. App. P. 11 application filed.* Accordingly, we turn to address whether the evidence was sufficient to sustain the Defendant's convictions for criminally negligent homicide and vehicular assault by intoxication.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v.*

*Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This Court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted).

In Count 1 the jury found the Defendant not guilty of vehicular homicide due to intoxication but found him guilty of the lesser-included offense of criminally negligent homicide. Criminally negligent homicide is defined as "[c]riminally negligent conduct which results in death." T.C.A. § 39-13-212(a) (2014).

> "Criminal negligence" refers to a person who acts with criminal negligence with respect to the circumstances surrounding that person's conduct or the result of that conduct when the person ought to be aware of a

substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint.

T.C.A. § 39-11-106(a)(4).

Viewing the evidence in the light most favorable to the State, the evidence shows that "the victim's death was the natural and probable result of the defendant's unlawful conduct." *State v. Farner*, 66 S.W.3d 188, 202 (Tenn. 2001). The proof showed that an officer saw the Defendant drinking alcohol shortly before the car accident and told the Defendant not to drink and drive. The Defendant, whose license was suspended, drove anyway after consuming alcohol. When he was in the center lane of a three-lane southbound highway, he decided to make a quick right turn into a gas station. After initiating his turn, he hit a motorcycle that Mr. Beasley was driving and upon which Ms. Beasley was riding. More than two hours after this incident, the Defendant's blood alcohol content was still .08 percent. Mr. Beasley was thrown a significant distance from the motorcycle, and his body was wrapped around a bench when found by emergency responders. We conclude that this evidence was sufficient to prove the greater offense of vehicular homicide by intoxication. In proving the greater offense the State necessarily has proven the lesser offense because all of the statutory elements of the lesser offense are included in the greater. *State v. Allen*, 69 S.W.3d 181, 188 (Tenn. 2002) (citing *State v. Bowles*, 52 S.W.3d 69, 80 (Tenn. 2001)). Therefore the evidence is sufficient to support the Defendant's conviction for the lesser-included offense of criminally negligent homicide.

We further conclude that the evidence is sufficient to sustain the Defendant's conviction for vehicular assault due to intoxication. Vehicular assault occurs when a person "recklessly causes serious injury to another person by the operation of a motor vehicle" as "the proximate result" of being intoxicated. T.C.A. § 39-13-106(a) (2014). The evidence proved that the Defendant's blood alcohol level was .08 two hours after the accident and that it was likely between .10 and .12 at the time of the accident. The evidence also showed that the Defendant was traveling in the center lane of a three lane roadway and that he decided to turn right, crossing one lanes of traffic when so doing. The Defendant hit the victims, who were in the far right lane, at such a speed and with such force that they were both thrown a great distance from the motorcycle. The jury could have concluded that the Defendant's intoxication caused him to make a right hand turn from the center lane, thereby causing the accident that killed one victim and seriously injured another victim. *See State v. Samuel T. Cravens*, No. M2004-01710-CCA-R3-CD, 2005 WL 2043826, at *6 (Tenn. Crim. App., Nashville, Aug. 25, 2005)

9

(affirming sufficiency of the evidence to support the defendant's vehicular assault and assault convictions because a rational jury could have concluded that the defendant's undisputed alcohol intoxication was the proximate cause of the reckless operation of his vehicle, swerving into the wrong lane of traffic, thereby causing the automobile accident and injuring three people), *no Tenn. R. App. P. 11 application filed.* The Defendant is not entitled to relief on this issue.

### III. Conclusion

After a thorough review of the record and relevant authorities, we affirm the trial court's judgments.

_____
ROBERT W. WEDEMEYER, JUDGE